# EXHIBIT 2

# The History of the Federal Firearms License (FFL) in America





FEDERAL FIREARMS LICENSE EXPERTS

*by: Brandon L. Maddox*



# The History of the Federal Firearms License (FFL) in America

The Second Amendment of the United States Constitution guarantees an individual right for US citizens to keep and bear arms. This has been affirmed by the Supreme Court of the United States and in essence means that the people of the United States shall not be prohibited from possessing arms by the federal government. However the Justices ruled that this does not mean that this is an absolute right and that some measures may be taken to ensure that arms are not available to some people. Federal Firearms Laws are mostly hinged on the Federal Firearms License (FFL) system.

Historically, the number of FFLs corresponds to political and social trends within the United States. When there is a high demand for firearms, the number of FFLs tends to increase. At certain points in time, political leaders have sought to reduce the number of FFLs for this reason, but if Americans are anything, they are resourceful and despite roadblocks thrown up by politicians and bureaucrats, people will demand more firearms when the arms are in danger of being banned or if people need them for personal safety or as investments in time of financial crisis.

In the following pages we will examine these trends and display the history of the laws impacting the FFL dealer and how changes in the social and political landscapes in the US have impacted the number of FFL dealers across the country, whether positively or negatively, specifically from 1968 to the present.

All charts and hard statistical numbers were provided by the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) and are Public Information.



# Contents

The History of the Federal Firearms License (FFL) in America...................................................2

The Federal Firearms Act of 1938...................................................................................4

The Gun Control Act of 1968.........................................................................................4

    Beyond the FFL...............................................................................................7

    Analysis of the GCA and its affect on numbers of FFLs...........................................7

The Firearms Owners' Protection Act of 1986...................................................................8

The 1990s and dark times for gun owners.....................................................................10

The role of the Internet................................................................................................12

The Collector's license (03)..........................................................................................12

The Role of the NFA post-2004....................................................................................12

Manufacturing FFLs  (Types 07 and 10).........................................................................13

In Conclusion............................................................................................................14

Works Cited..............................................................................................................15

## The Federal Firearms Act of 1938

The Federal Firearms License has its origins in a little known law called the Federal Firearms Act that was enacted in 1938 and was originally codified to Title 15. This governed "Commerce and Trade". The jurisdictional limits of the US government with regard to the FFL were regulated to interstate commerce and foreign trade. (Carter, 2006)

Prior to 1938 there were dealers in firearms in the United States such as department stores, hardware stores, military post exchanges, gun shops and sporting goods stores. Yet, there were no laws preventing people from ordering firearms directly from the manufacturer or sending them across state lines through the US Mail or other common carrier. The Federal Firearms Act changed that by requiring the establishment of the Federal Firearms License. (Carter, 2006)

The Act additionally stipulated that records of importation and sale of firearms and ammunition be maintained and forbade individuals indicted or convicted of a crime of violence from shipping or receiving any firearm in interstate commerce. Additionally it made it unlawful to possess any firearm with altered or obliterated serial numbers and forbade possession of ammunition or firearms that were stolen during interstate shipment. (Carter, 2006)

This push for gun control at the federal level had been started 4 years earlier with the passage of the National Firearms Act (NFA) that governed registration of machineguns and short barreled long guns. America was following the trends of certain European nations, but the push for gun control seemed to stop after 1941, after seeing firsthand how those laws had failed Europe during World War 2. (Knox, 2009)

The Federal Firearms Act was actually repealed in effect in 1968, but its intent was merely rewritten and represented a severe shift in how the federal government looked into regulating firearms sales. (Carter, 2006)

## The Gun Control Act of 1968

"Our citizens must get licenses to fish, to hunt and to drive. Certainly no less should be required for the possession of lethal weapons that have caused so much horror and heartbreak in this country." President Lyndon B Johnson, 1966

President Johnson attempted to have a bill passed through the US Congress to register all handguns in the country as well as all gun owners. Additionally Johnson wanted to ban ordering firearms through the mail and the importation of certain classes of firearms. The bill

4



was known as the Omnibus Safe Streets and Crime Control Act of 1968 and was part of President Lyndon B. Johnson's Great Society series of programs. (Carter, 2006)

Although the bill had been first introduced in 1966, prior to the assassinations of Senator Robert Kennedy and Civil Rights Leader Martin Luther King, Jr. and the widespread riots in urban areas in the late 1960s; these events helped to garner support for its passage. Its name changed to the US Gun Control Act of 1968 (GCA68). (Carter, 2006)

In June 1968, a tie vote in the House Judiciary Committee halted the passage of Bill H.R. 17735. On reconsideration nine days later, the bill was passed by the committee. The Senate Judiciary Committee similarly brought the bill to a temporary halt, but as in the House, it was passed on reconsideration and was signed into law by President Johnson and enacted October 22, 1968 as Pub.L. 90–618, 82 Stat. 1213-2. (Carter, 2006)

The GCA repealed much of the Federal Firearms Act and moved it from the jurisdiction of interstate commerce to regulation and control focused on crime by placing it within Title 18 of the US Code.  (Carter, 2006)

The direct mail order of firearms (except antique firearms) by consumers was now prohibited. Manufacturers, importers, importing and companies engaged in the business of selling firearms had to obtain a Federal Firearms License known as an FFL from the Secretary of the Treasury. These FFLs became the go-between for anyone who wanted to purchase a firearm in an interstate transaction. The FFL is required to maintain records of all acquisitions and dispositions of firearms and comply with applicable state and local laws in transferring firearms.  (Carter, 2006)

GCA banned unlicensed individuals from acquiring handguns outside their state of residence, but long gun sales were permitted providing that the seller was an FFL and that the sale complied with the laws in both the state of purchase and the state of residence. (Carter, 2006)

Furthermore the GCA made it unlawful for certain persons to receive firearms, and made it a felony for an FFL to transfer a firearm knowing, or having reasonable cause to believe, that the transferee is prohibited from receiving the firearm. Subsequent amendments made it unlawful for any person to knowingly transfer a firearm to a prohibited person, and made it unlawful for prohibited persons to possess a firearm.

Prohibited persons included felons, fugitives, drug addicts and unlawful drug users, those committed to mental institutions or adjudicated as "mentally defective", servicemen who were dishonorably discharged from the armed forces, those who have renounced their United States citizenship and Illegal or nonimmigrant aliens (Carter, 2006)

The GCA made it unlawful for an FFL to transfer a handgun to anyone under the age of 21, or a long gun to anyone under the age of 18. Young people between the ages of 18 and 21 may still buy handguns from non-licensed sellers in the secondary market, and there are no age restrictions on the transfer of rifles and shotguns by non-licensed sellers.

| Federal Firearms License Types | |
|---|---|
| Type | Definition |
| 1 | Title 1 dealer or gunsmith other than destructive devices. A Type 1 Dealer may deal in Title II NFA (National Firearms Act) firearms with a class 3 tax stamp. |
| 2 | Title 1 dealer doing business as a pawnbroker. |
| 3 | Licensed collector of Curio & Relic (C&R) firearms. |
| 6 | Licensed manufacturer of ammunition and reloading components other than ammunition for destructive devices or armor piercing ammunition. |
| 7 | Title 1 manufacturer of firearms and ammunition, who may act as dealer; may not manufacture or deal in destructive devices, ammunition for destructive devices, or armor piercing ammunition. Can manufacture & deal in Title II NFA firearms with a class 2 tax stamp. |
| 8 | Importer of Title 1 firearms and ammunition. Can also import Title II NFA firearms with class 1 tax stamp. |
| 9 | Dealer in firearms, including destructive devices, ammunition for destructive devices, and armor piercing ammunition. Requires payment as an SOT (Special Occupation Taxpayer) Class 1 (can act as an NFA Dealer). To deal/broker any destructive device with explosives content requires an additional Federal Explosives License as a Dealer of High Explosives. |
| 10 | Manufacturer of firearms, ammunition and ammunition components, manufacturer of destructive devices, ammunition for destructive devices, and armor piercing ammunition; may deal in all of the aforementioned items. Requires payment as an SOT Class 2 (can act as an NFA Dealer). To manufacture any DESTRUCTIVE DEVICE with explosives content requires an additional FFL as a Type 20 Manufacturer of High Explosives. |
| 11 | Importer of firearms, ammunition, destructive devices, ammunition for destructive devices, and armor piercing ammunition; may deal in all the aforementioned items. Requires payment as an SOT Class 1. To import any |

6

| | DESTRUCTIVE DEVICE with explosives content requires an additional FEL as an Importer of High Explosives. |
|---|---|

## *Beyond the FFL*

Johnson did not get his provision for the registration of all handguns and gun owners passed in GCA, but the Act did prohibit the importation of certain handguns. The GCA established a framework for "curbing the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting and hunting." This is known as the "suitable for sporting purposes" clause that is placed on imported firearms. Handguns were the primary target of GCA and they are judged against a set of criteria which include overall length, frame construction, weight, caliber and safety features. This criterion has not been reexamined since it was put in place in 1968.

## *Analysis of the GCA and its effect on numbers of FFLs*

As could be imagined with a law of this magnitude, a bureaucracy was created to administer the FFL system. The graph below shows the number of 01 (Dealer) FFLs between 1975 (7 years after GCA) and 2012.



## The Firearms Owners' Protection Act of 1986

In 1986 the US Congress loosened several controls that had been established in the GCA. The stated purpose of the Firearms Owners' Protection Act of 1986 (FOPA) was to ensure that the GCA did not "place any undue or unnecessary Federal restrictions or burdens on law abiding citizens". (Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), as amended. )

FOPA came with some positive changes and some negative ones.

- ✓ Allowed an FFL to temporarily conduct business away from their normal place of business, such as at a gun show.
- ✓ Reduced the criminal penalties for certain recordkeeping offenses committed by an FFL from a felony to a misdemeanor.
- ✓ Prohibited the ATF from centralizing or computerizing firearms purchase records.
- ✓ Allowed the sale of ammunition and reloading components without an FFL.
- ✓ Allowed a convicted felon to obtain firearms where the convicting jurisdiction automatically restored the felons' civil rights upon release from prison or completion of their sentence.

✓ Prohibited the ATF from conducting more than one warrantless compliance inspection of a licensee in any 12-month period.
✓ Required the ATF to prove either a "knowing" or "willful" state of mind for all GCA violations.
✓ Made it unlawful for anyone, not just FFLs, to sell firearms to prohibited persons.
✓ Required any forfeiture proceeding of any firearm or ammunition involved in any violation of the GCA to be commenced within 120 days of seizure.
✓ Eliminated the requirement of 03 licensees (Collectors) to transfer firearms on a 4473, relying instead on merely the Bound Book.

On the negative side, FOPA sought to remove the acquisition of an FFL for strictly personal use or strictly personal gain. Changes from those who "engage in the business" of dealing in firearms (and are therefore required to have a license) to include only those who devote "time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Significantly, FOPA excluded those who buy and sell firearms to only "enhance a personal collection" or only for a "hobby," or who "sell all or part of a personal collection." The Internet and auction websites have changed this aspect greatly over recent years; we will address this in a later section.

The real "poison pill" contained within FOPA prohibited the manufacture of machine guns for civilian transferees and as a result the transferable NFA registry has been closed since May 1986. This was known as the Hughes Amendment and was submitted by William Hughes (D-NJ) in the hopes that the entire bill would fail in the congress. After a clear one-sided voice vote against amending the bill to include the Hughes Amendment, acting Chairman Charles Rangel (D-NY) refused to have a recorded ballot vote and the amended bill went on to the Senate where it was passed. (Davidson, 1988)

FOPA was signed into law by President Ronald Reagan on May 19, 1986 and became Public Law 99-308.[1]

---

[1] (Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 as amended., 1986)

## The 1990s and dark times for gun owners

Despite the closing of the NFA registry to transferable machineguns in 1986, the 1980s were relatively quiet with attempts at gun control at the federal level, until 1989 when President George H.W. Bush banned the importation of 43 specifically named semiautomatic rifles by executive order under the sporting purposes clause of the 1968 GCA. It was a foreshadowing of things to come for gun owners and FFLs.

The importation ban was one factor that had an effect on the outcome of the 1992 elections. A weak economy and a third party candidate pulled votes away from Bush and paved the way for Bill Clinton to take office. Clinton would make gun control a top priority for his administration in his first term and with the help of a democrat congress, he narrowly passed a ban on the new manufacture of semiautomatic rifles that met the criteria of a so-called "Assault Weapon" and the Brady Law, which lead to the introduction of the National Instant Background Check System (NICS) for all firearm sales through an FFL.

Not content to stop there, in August 1993 Clinton directed the ATF to conduct a review of the FFL system. According to the review over 40% of FFLs were not engaged in the business of selling or transferring firearms, but rather were using the licenses to enhance their personal collections or in some cases to simply make it easier to receive a firearm directly. The latter was notable in the case of writers who wrote about firearms and a few celebrities such as retired General Norman Schwarzkopf who received numerous gifts of firearms from admirers. (Schwarzkopf, 2012)

Laws passed under the Clinton Administration such as the Brady Law changed the licensing procedures for FFLs by increasing the fee from $10 per year to $200 for three years and the Violent Crime Control and Law Enforcement Act of 1994 required FFLs to submit photographs and fingerprints as part of their application as well as to certify that their business complied with all state and local laws, including zoning regulations. Due to these efforts, the number of FFLs dropped from over 282,000 in 1993 to fewer than 104,000 by 1999.

The following chart shows this sharp decline in FFL numbers. Note the huge drop between 1993 and 1997, as the FFL comes up for renewal every three years.







Between 1992 and 2001 a total of 718 FFL applications were denied. In that same time period 16,165 FFLs were abandoned and 9,402 were withdrawn by the licensees during processing. This was as a direct result of the increased demands and fees to obtain or maintain a license as a result of the licensing procedures.



## The role of the internet

The Year 2000 brought another change in presidential administrations, this time it was President George W Bush who did not see gun control as a priority. When the 1994 Assault Weapon Ban provision of the Crime Bill came up for renewal in 2004; the President chose to let the law sunset as its impact on crime was seen as minimal. Similarly the ban on magazines holding more than 10 rounds met the same fate. (Feldman, 2011)

This caused a boom in the firearms industry and a demand for firearms that had until recently been outlawed. It changed the nature of the business model for a number of dealers. No longer would a dealer have to accrue an enormous inventory to satisfy customers' demands. Firearms could be selected from online catalogs or purchased via auction sites and sent to the dealer to complete the transfer, making home based FFL dealers a booming side business. (Feldman, 2011)

### The Collector's license (03)

The most notable increase in FFLs was the 03 type for collectors which rose from 16,635 in 1997 to over 61,885 in 2013, a 400% increase. The reason for this was primarily the static 50-year requirement for a firearm to be considered a Curio or Relic. Pre-World War 2 firearms were on the list for decades, as were military issue non-NFA items. (Magaw, 1996)

However as firearms made in the 1950s and 1960s became eligible, the demand for obtaining them directly through the mail caused a surge in demand, coupled with the fact that having a Collector's license could represent a significant discount with certain suppliers of ammunition, accessories and parts.

### The Role of the NFA post-2004 (Class 3 weapons)

The second largest expansion at this point was the demand for NFA items and the need for Class 3 (SOT) transfer dealers.

The 1986 Hughes amendment to FOPA and years of misinformation about NFA items kept most people away from them. With the spread of information on the internet it became clear that owning an NFA item did not mean surrendering your rights under the fourth amendment. The 1994 ban on semiautomatic rifles included restrictions on length as well as threaded barrels, the demise of these limitations lead to an explosion in consumers wanting sound suppressors and short barreled rifles (as well as pre-1986 machineguns).

In 2005, one year after the sunset of the 1994 ban on semiautomatic rifles based on cosmetic features, the number of NFA forms processed was 41,579. Every year since that number has increased to 2012's record number of 137,649 representing a 250% increase.

| NFA Forms by Year | | |
|---|---|---|
| Fiscal Year | | Forms Processed |
| 2012 | | 137,649 |
| 2011 | | 105,373 |
| 2010 | | 91,949 |
| 2009 | | 86,753 |
| 2008 | | 72,808 |
| 2007 | | 66,560 |
| 2006 | | 57,783 |
| 2005 | | 41,579 |

## Manufacturing FFLs  (Types 07 and 10)

The highest growth rate in the industry judging by FFL types has to be the manufacturing licenses for firearms (07) and destructive devices (10). There were 387 of these types of manufacturers in 1975 and the numbers steadily rose throughout the years by 10% on average; as of 2012 that total amount is 7,684. According to the National Shooting Sports Foundation (NSSF) the total number of FFLs has increased by 25.8% over the past 10 years, while the total number of firearms manufacturers has increased by 262.8%. NSSF used the same data that is available to the public and published by the BATFE to arrive at these figures.

This increase began in earnest following the 2008 elections as manufacturers sought new suppliers for receivers and frames in order to keep up with the demand for firearms under the newly elected President Barack Obama who was known to have anti-gun leanings. (Paddock, 2009)

The increases in licensing applications after Obama's calls for stricter gun control in the wake of highly publicized mass shootings such as Virginia Tech, Aurora and Sandy Hook in 2012 reflect the public's demand for more firearms before certain classes of firearms are restricted once again, but as these applications move with the pace of the bureacracy, meaningful results may not be seen for a number of years.

Nevertheless the following chart bears these statistics as a huge upward swing in manufacturing that began in 2010.



## In Conclusion

Obtaining an FFL went from a process of simply filling out a form and paying a nominal fee into an arduous process that required an extensive background check, local requirements, a substantially increased fee and the submission of fingerprints and photographs. Additional requirements include a background check on all owners of the FFL and potential compliance visits from the BATFE.

As the nature of the firearms industry continues to change along with the political leanings of the three branches of the federal government, we will see similar fluctuations in the number of licenses issued across the board.

Passage of laws requiring universal background checks at the federal level may cause more dealer FFL applications to be submitted as more dealers may be needed to keep pace with the number of private party transactions.

Likewise, calls for microstamping laws or smart guns may cause new manufacturers to obtain licenses in the face of this new and unproven technology. By the same token, laws such as these could sound the death knell for not only firearms manufacturers, but ammunition manufacturers as well.

Although fluctuations over time have impacted the number of FFL dealers, the continued growth in all shooting sports and the number of women entering the sport show a great future for this profession.

## Works Cited

Carter, Gregg Lee (2006). *Gun Control in the United States: A Reference Handbook*. ABC-CLIO. p. 157 ISBN 978-1-85109-760-9.

Davidson, Osha Gray (1998). Under Fire: The NRA and the Battle for Gun Control. University of Iowa Press. p. 322. ISBN 978-0-87745-646-9.

Feldman, Richard (2011). *Ricochet: Confessions of a Gun Lobbyist*. John Wiley & Sons. p. 226. ISBN 978-1-118-13099-5.

Knox, Neal (2009). *Neal Knox - The Gun Rights War*. MacFarlane Press. p. 87. ISBN 978-0-9768633-0-4.

Magaw, John W. (1996). *Federal Firearms Regulations Reference Guide*. BATFE. ISBN 978-0-7881-2821-9.

Paddock, Carl (2009). *Obama Creator of History*. Epitome Books. p. 101. ISBN 978-81-907734-2-3.

Roth, Mitchel (2010). *Crime and Punishment: A History of the Criminal Justice System*. Cengage Learning. p. 279. ISBN 0-495-80988-8.

Schwarzkopf, H. Norman (2012). It Doesn't Take a Hero. Transworld Publishers Limited. ISBN 978-0-85750-168-4.

Spitzer, Robert J. (2001). *The Right to Bear Arms: Rights and Liberties under the Law*. ABC-CLIO. p. 95. ISBN 978-1-57607-347-6.